IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LEONARD T. HILT,                    )
                                    )
v.                                  )          No. 3:05-0371
                                    )
R. JAMES NICHOLSON,                 )
        Secretary, Department of Veterans    )
        Affairs,                    )

**<u>MEMORANDUM</u>**

Pursuant to the provisions of 28 U.S.C. § 636 and Rule 73(b) of the Federal Rules of

Civil Procedure, the parties in this action have consented to have the Magistrate Judge

conduct any and all further proceedings in the action and the action has been referred to

the Magistrate Judge for all further proceedings, including entry of final judgment.  *See*

Order entered February 28, 2006.  (Docket Entry No. 16).

Pending before the Court is the defendant's Motion to Dismiss or, in the Alternative,

for Summary Judgment (Docket Entry No. 26).  Attached to the defendant's memorandum

were multiple documents.  The plaintiff referred extensively to these documents in his

response, and the Court has considered them in reaching its decision.  Therefore, this

motion will be treated as a motion for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 12(b). The plaintiff filed a response in

1

opposition in which he voluntarily withdraws two of his three original claims (Docket Entry No. 32). The defendant did not file a reply.

For the reasons discussed herein, the defendant's motion is GRANTED.

## I. BACKGROUND AND PROCEDURAL HISTORY

The plaintiff is an African-American male who was employed by the Department of Veterans Affairs ("VA") at the agency's Tennessee Valley Healthcare System in Nashville, Tennessee, as a podiatrist from December of 1991 until his voluntary retirement on March 15, 2006.[1] The plaintiff initially enjoyed a pleasant working relationship with the staff and his fellow physicians. However, both his working relationships and his personal health deteriorated over the course of his employment.

On January 22, 1999, the plaintiff's supervisor, Dr. Rudolph Cumberbatch, wrote a memo to the Chief of Staff at the VA Hospital expressing concerns about the plaintiff's mental and physical health, as well as his alleged "inappropriate behavior." Exhibit C-13

---

[1]Unless otherwise specified, the facts as set forth in this section are taken from the plaintiff's complaint (Docket Entry No. 1), portions of the plaintiff's sworn testimony before an Equal Employment Opportunity ("EEO") investigator (Exhibit 2 to Docket Entry No. 27), the defendant's statement of undisputed material facts in support of his motion for summary judgment (Docket Entry No. 28), and the plaintiff's response (Docket Entry No. 32).

to Docket Entry No. 27.[2]  In the memo, Dr. Cumberbatch requested that an evaluation of the plaintiff be conducted to determine his fitness for duty.  *Id.*  Also in January 1999, the plaintiff received his first proficiency rating from Dr. Cumberbatch covering the period of November 1997 through November 1998, containing ratings of "low satisfactory" in two out of five categories and negative comments.  Exhibit C-10 to Docket Entry 27.

In late May or early June of 1999, the plaintiff attended a meeting with Dr. Cumberbatch, Dr. L. Burns, also a VA podiatrist, and Ruth Vickens, the Administrative Officer, during which the plaintiff and Dr. Burns exchanged words.  The plaintiff and Dr. Burns were at one time friends and roommates, though their relationship deteriorated after Dr. Burns came to work at the VA Hospital.  According to the plaintiff's account of this meeting as contained in his deposition, Dr. Burns asked several confrontational questions that made the plaintiff angry and led the plaintiff to call Dr. Burns a "snake."  Dr. Burns replied that the plaintiff ought to know a snake, being a Jehovah's Witness.

---

[2]The exhibits are described herein by the numbers and letters as they appear on the bottom right hand corner of the documents and as listed on the Court's docket.  Although it may be that the exhibits were numbered as attachments to the plaintiff's deposition, the designation of exhibits does not appear to follow any rational basis.  For instance, there is no Exhibit 1, and the exhibits beginning with the letter "A" only include "A-4," "A-4(2)," and "A-6," and the exhibits beginning with the letter "C" do not include "C-1," "C-6," "C-8," "C-11," or "C-12."

3

Dr. Cumberbatch then said, "Dr. Hilt, I didn't know you were a Christian."[3]  Exhibit 3, at

15-16, to Docket Entry No. 27.

As a result of this exchange, the plaintiff contacted his Union representative, and he

subsequently made an initial Equal Employment Opportunity ("EEO") complaint of

religious discrimination on June 28, 1999.  This complaint was dismissed at the

administrative level on August 17, 1999.

In approximately December of 1999, the plaintiff received his second proficiency

rating conducted by Dr. Cumberbatch covering the period from November 12, 1998, to

September 3, 1999.  In this review, Dr. Cumberbatch reported that the plaintiff was

performing at the level of "low satisfactory" in even more categories than the previous

year, and gave him a "low" rating in four out of five areas.  Exhibit C-2 to Docket Entry

No. 27.

According to the plaintiff, he was on medical leave between November 2, 1999, and

August 13, 2000.  Exhibit 2, at 32, to Docket Entry No. 29.  In November 1999, the plaintiff

had three surgeries on the same foot due to osteomyelitis.  On May 19, 2000, while the

plaintiff was on medical leave, Dr. Cumberbatch amended the second proficiency rating

to state that the plaintiff's "current health problems may have impacted [his] ability to

_____

[3]The plaintiff omits the comments of Dr. Cumberbatch when he first relates his
version of the events at this meeting to the EEO examiner in his interview/sworn statement
in December 2000.  It is not until his July 27, 2006, deposition that the plaintiff indicates that
Dr. Cumberbatch made this remark, or any remark at all.

4

perform in an operating room setting."[4]  Exhibit A-6 to Docket Entry No. 27.  On July 31, 2000, the plaintiff lodged an administrative complaint alleging retaliation because of the plaintiff's June 28, 1999, EEO complaint.  The plaintiff recalled returning from medical leave on or about August 13, 2000, though upon returning to work, he voluntarily withdrew himself from surgical duties to allow himself to heal.  On August 30, 2000, the plaintiff's left big toe was amputated.  *Id.* at 28, 32-33.

An EEO investigator conducted a sworn interview with the plaintiff on December 11, 2000.  During his testimony, the plaintiff alleged reprisal for EEO activity in the form of low ratings on the second proficiency report and what the plaintiff appears to believe to be the May 19, 2000, restriction from surgery.

On October 27, 2003, due to increasingly frequent absences for medical appointments associated with his health problems, the plaintiff was required to submit dates and times for all of his personal medical appointments for a three-month period.  The plaintiff additionally alleged that his supervisor sent three emails to an individual who was not his supervisor containing information about the plaintiff's medical treatment.  The plaintiff further alleged that he was required to consult with a newly-licensed podiatrist

---

[4]The Court is unable to locate the May 19, 2000, amendment to the plaintiff's November 1998-September 1999 proficiency rating in the documents submitted by the parties.  There are several references to the amendment, however, including a document from the EEO that purports to quote Dr. Cumberbatch's amendment, cited in the text above.

before making referrals as a form of punishing him, even though he admits that this policy applied to everyone and not just specifically to him.

On March 14, 2004, the plaintiff filed an EEO complaint alleging reprisal for prior EEO activity because his Section Chief required him to submit the times and dates of his personal medical appointments for a three month period, because his Section Chief sent three emails to a non-supervisor about his personal medical appointments, because his Section Chief stated that he "was watching" the plaintiff, and because he was required to consult with an inexperienced, newly-licensed podiatrist before making referrals to vascular service. Exhibit A-4(2) and Exhibit B-1 to Docket Entry No. 27. As discussed in more detail below, in his response to the defendant's motion, the plaintiff formally withdrew his claims relating to these allegations.

The plaintiff originally based the complaint in this case on the charges presented in the two administrative complaints of discrimination made on July 31, 2000, and March 14, 2004, although the plaintiff has now voluntarily withdrawn the claims comprising his March 14, 2004, complaint. As previously noted, the June 1999 complaint of religious discrimination was dismissed at the administrative level, and is at issue now only insofar as it relates to the alleged retaliatory behavior. Therefore, only the claims presented in the July 31, 2000, administrative complaint remain in play.

6

The plaintiff's complaint contains three counts. Count I is brought under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq., alleging unlawful discrimination on the basis of his disability, identified in his complaint to be leukemia. Count II alleges discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., in the form of unlawful retaliation against the plaintiff on the basis of his participation in EEO activities and/or his opposition to his supervisors' discriminatory practices. Count III alleges further discriminatory conduct in the form of a hostile work environment.

In his response to the defendant's motion to dismiss or for summary judgment, the plaintiff voluntarily withdrew his allegation of disability discrimination (Count I) in recognition of the validity of the defendant's argument that this Court lacks subject matter jurisdiction due to the plaintiff's failure to raise or pursue this matter at the administrative level. The plaintiff also formally withdrew the claims contained in his administrative complaint of March 14, 2004,

> namely whether he was subjected to reprisal when, on October 27, 2003, he was (1) required to submit the dates and times of all medical appointments for a three month period; (2) his supervisor sent three emails to an individual who is not his supervisor regarding his medical appointments; and (3) required [sic] to consult with an inexperienced newly licensed Podiatrist before making referrals to vascular service,

which constitute the hostile work environment allegations supporting Count III. *See* Docket Entry No. 32, at 3.

7

Therefore, the only remaining count of the plaintiff's original three counts is Count II,[5] dealing with unlawful retaliation under Title VII, and this count is at issue only insofar as described in and supported by the claims in the plaintiff's July 2000 EEO complaint. The complaint form itself is blank except for a signature (Exhibit A-4 to Docket Entry No. 27), but the plaintiff described his specific allegations in the December 11, 2000, interview with the EEO investigator (Exhibit 2 to Docket Entry No. 27). Specifically, the plaintiff asserted that he was retaliated against by receiving lowered proficiency ratings for the period covering November 12, 1998, through September 3, 1999. *See* Docket Entry No. 32, at 4. The plaintiff also pointed to a May 19, 2000, amendment to the 1998-1999 proficiency report which allegedly imposed a restriction upon the plaintiff's ability to perform surgery at the VA. *See id.,* at 6.

---

[5]The plaintiff states that he "withdraws *Count II* of his federal court complaint wherein he alleges disability discrimination." *See* Docket Entry No. 32, at 3 (emphasis added). Count II of his complaint is actually his retaliation claim, which is apparently the only claim that the plaintiff *is not* withdrawing, and therefore the only remaining viable claim for purposes of the defendant's present motion. The Court is convinced that this was merely a typographical error, and that the plaintiff intended to withdraw Counts I and III dealing with disability discrimination and a hostile work environment, respectively, and to go forward on Count II alleging retaliation, and the Court here proceeds under this assumption.

## A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the Court must view the factual evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

If the nonmoving party fails to make a sufficient showing on an essential element of the case with respect to which he has the burden, however, the moving party is entitled

to summary judgment as a matter of law.  *See Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999).  To preclude summary judgment, the nonmoving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial."  *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002).  "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).  If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fairminded jury to find for the nonmoving party, the motion for summary judgment should be granted.  *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate."  *Hill v. White*, 190 F.3d 427, 430 (6th Cir.1999) (citing *Anderson*, 477 U.S. at 247-49).


**B.  Retaliation under Title VII**

The anti-retaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), provides that it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified,

10

assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Retaliation may be proven by either direct evidence or circumstantial evidence by way of the *McDonnell Douglas* burden shifting framework. *See Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 561* (6th Cir. 2004).

Absent direct evidence of retaliation, the plaintiff may still proceed by presenting circumstantial evidence. Circumstantial evidence does not facially establish discrimination, but permits the finder of fact to draw reasonable inferences that discrimination occurred. *See Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). A case presented using circumstantial evidence utilizes the *McDonnell Douglas* burden shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

First, the plaintiff must present a prima facie case. To establish a prima facie case of retaliation, the plaintiff must show that (1) he engaged in activity protected by Title VII, (2) the defendant knew he engaged in this activity, (3) the defendant subsequently took an adverse, retaliatory action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor, and (4) a causal connection exists between the protected activity and the adverse employment action. *See Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006).

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate reason for its employment action. If the employer does so, the

11

plaintiff may then prevail only by showing that the articulated reason is false or pretextual. *See Wrenn v. Gould*, 808 F.2d 493, 500-01 (6th Cir. 1987). However, the ultimate burden of proof always rests with the plaintiff. *See St. Mary's Honor Ctr. v. Hicks*, 113 S.Ct. 2742, 2746-48 (1993).

## II.  ANALYSIS

The plaintiff alleges that he was retaliated against after he filed his claim of religious discrimination on June 28, 1999. He claims that because of his participation in protected EEO activity, his supervisor, Dr. Cumberbatch, assigned "low satisfactory" ratings and made negative comments in the plaintiff's proficiency report for the period of November 12, 1998, through September 3, 1999. *See* Docket Entry No. 32, at 4.[6] The plaintiff also asserts that Dr. Cumberbatch later amended this same proficiency report in May 2000, raising concerns about the plaintiff's health and allegedly affecting his surgical privileges. Exhibit A-6 to Docket Entry No. 27.

---

[6]The defendant argues that the report containing low ratings and negative comments relied upon by the plaintiff is the report covering the period of November 12, 1997, to November 12, 1998, which was prepared *before* the plaintiff initiated his religious discrimination complaint in June 1999, which therefore could not have been prepared with any retaliatory purpose. Docket Entry No. 27, at 8. The plaintiff contends, however, that it is the second, later proficiency report that is at issue. Taking the facts in the light most favorable to the plaintiff, the Court assumes that the pertinent report is the 1998-1999 report, prepared after the plaintiff initiated his religious discrimination complaint.

12

There is no dispute regarding the first two elements of the plaintiff's prima facie case of retaliation. The plaintiff engaged in protected activity when he contacted the EEO office and filed a complaint of religious discrimination, and this activity was known to the defendant. The question is whether there are genuine issues of material fact with respect to whether the defendant took an adverse employment action against the plaintiff.

The law of the Sixth Circuit with respect to the third element of the prima facie case in retaliation actions has recently changed in the wake of the United States Supreme Court's decision in *Burlington Northern & Santa Fe Railway Co. v. White*, ___ U.S. ___, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). The Supreme Court in *Burlington* addressed whether the alleged retaliation must be employment- or workplace-related and how harmful that action must be to constitute retaliation.

The plaintiff in *Burlington* claimed retaliation following her filing of a gender discrimination claim with the EEOC based on changed job responsibilities (to a lower-status, dirtier job) and a 37-day suspension without pay. The Court rejected the standard previously followed by this and other circuits, holding that the scope of Title VII's anti-retaliation provision, unlike the substantive discrimination provisions of Title VII, extends beyond workplace-related or employment-related retaliatory acts and harm. 126 S.Ct. at 2414. The *Burlington* Court also provided some guidance as to the requisite seriousness of the alleged harm, stating that "a plaintiff must show that a reasonable employee would

13

have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal quotations and citations omitted). Further, the harm suffered must be materially adverse, and "significant as opposed to trivial." *Id.* at 2415. The standard is an objective one. *Id.* However, the Court emphasized that "the significance of any given act of retaliation will often depend on the particular circumstances." *Id.* The *Burlington* Court ultimately concluded that assigning the plaintiff to less desirable job duties and suspending her without pay, despite the fact that she was later reinstated with pay, amounted to materially adverse acts in retaliation for filing her EEOC complaint. *Id.* at 2417-18.

In this case, the plaintiff alleges that he was subjected to adverse employment actions consisting of 1) a lowered performance evaluation and 2) suspension of surgical privileges. Even under the newer, more expansive standard as set forth in *Burlington*, neither act rises to the level of an adverse employment action.

The plaintiff points to the lowered performance evaluation as evidence of retaliation against him in response to his protected EEO activity.[7] During the time that the plaintiff worked under the supervision of Dr. Cumberbatch, it was Dr. Cumberbatch's

---

[7]There is some question whether the plaintiff believes the lowered performance evaluation was in response to his protected EEO activity of filing a religious discrimination complaint, or if he asserted at some point that he believed that the alleged retaliation was actually in response to his non-protected complaints to the union. *See* Docket Entry Nos. 28 and 32, at ¶ 10. However, the Court assumes for purposes of this motion that the plaintiff is properly alleging retaliation in response to protected activity.

14

responsibility to regularly complete performance evaluations for the plaintiff, and two of these evaluations are particularly important here. First, Dr. Cumberbatch completed a performance evaluation for the period of November 1997 through November 1998 that contained a "low satisfactory" rating in two of five categories, education and administrative competence. *See* Exhibit C-13 to Docket Entry No. 27. The plaintiff received this report in January 1999. The plaintiff admitted that this report predated his first EEO complaint, and he also conceded that he believed the lowered rating to be in retaliation for his earlier union grievances, and not in response to any protected activity. *See* Docket Entry Nos. 28 and 32, at ¶ 10. The parties agree that it was not until late May or early June of 1999 that the plaintiff attended the meeting during which his complaint of religious discrimination arose, and the plaintiff complained to the EEO office on June 2, 1999. *See* Docket Entry Nos. 28 and 32, at ¶ 5.

The plaintiff received his second evaluation, covering the period from November 1998 through September 1999, from Dr. Cumberbatch in December 1999.[8] *Id.* at ¶ 13. It is this evaluation that is allegedly retaliatory. This evaluation contained ratings of "low satisfactory" in three out of five categories, and included an overall rating of "low satisfactory," in contrast to the previous evaluation which gave an overall "satisfactory" rating. *See* Exhibits C-2 and C-10 to Docket Entry No. 27. Specifically, the plaintiff's prior

---

[8]The plaintiff was on extended sick leave during this time, as noted on the evaluation, so he may have actually received this evaluation at a later date.

rating of "high satisfactory" in clinical competence fell to "satisfactory," education and administrative competence remained "low satisfactory" on both evaluations, and personal qualities went from "satisfactory" to "low satisfactory." *Id.* Essentially, Dr. Cumberbatch lowered the plaintiff's ratings in the categories of clinical competence and personal qualities, and although the clinical competence rating technically fell, it remained at a level of at least "satisfactory."

This District has recently addressed the impact of *Burlington* in the case of *Secherest v. Lear Siegler Services, Inc.*, 2007 WL 1186597 (M.D. Tenn., April 16, 2007) (Wiseman, J.). The plaintiff in *Secherest* filed a claim of racial discrimination and subsequently was transferred several times within the company and received disciplinary write-ups. 2007 WL 1186597 at *1. She alleged that these actions were in retaliation for her discrimination complaint. Following a discussion of the standard as set forth in *Burlington*, the Court in *Secherest* concluded that "the actions taken by [the employer] after [the plaintiff] complained about the derogatory note do not rise to the level of adverse actions." *Id.*, at *4. The transfers did not involve any decrease in pay or prestige, and at least one transfer was made at the request of the plaintiff. Likewise, the Court found that the disciplinary write-ups were not materially adverse, taking into account that the plaintiff did not dispute the facts that led to the write-ups (failure to log hours and being out of uniform) and lost no pay as a result of the disciplinary actions.

16

In the present case, although the plaintiff disputes the basis for the lowered evaluation scores, he fails to show that the scores had any effect whatsoever beyond bruising his ego. With respect to the alleged suspension of his surgical privileges, the plaintiff was on medical leave at the time of the allegedly retaliatory action, he lost no pay or prestige, and he voluntarily removed himself from surgical service upon his return due to health concerns.

The Sixth Circuit has decided only a handful of cases directly applying the changed standard for an adverse employment action in a retaliation case. However, one of these cases addresses the *Burlington* standard in the context of performance evaluations, though the facts of that case are distinguishable from those in the present case. In *Halfacre v. Home Depot, U.S.A.*, 2007 WL 1028860 (6th Cir., April 3, 2007), the plaintiff, a long-time associate at Home Depot, expressed an interest in becoming a supervisor. He was not interviewed for the position because of concerns about his availability since he had a second job as a fireman. 2007 WL 1028860 at *1-*2. He was told he would "make a great manager," but that he was not considered for the promotion because of his job with the fire department, despite the fact that several other employees with second jobs or enrolled in school were allowed to serve as supervisors. *Id.* Halfacre, an African American, filed a charge of racial discrimination in July 2003 following the award of the promotion he sought to a less qualified white employee from a different department. *Id.*, at *2. Just two months later, in

17

September, Halfacre received an evaluation with an overall performance grade that was lower than all of his previous evaluations. In fact, previous evaluations were "generally stellar," and in marked contrast to the abruptly dismal evaluation in September 2003. *Id.*, at *8. After questioning his supervisors about the sudden drop in his scores, he received a second evaluation in December 2003, but the second evaluation retained the lowered scores. *Id.*, at *2.

Although the District Court granted the employer's motion for summary judgment on the grounds that lower performance evaluation scores did not rise to the level of retaliatory conduct, the Court of Appeals, in light of the intervening *Burlington* decision, reversed, noting that a lower evaluation could under certain circumstances "dissuade[] a reasonable worker from making or supporting a charge of discrimination," producing the chilling effect on reporting employer misconduct that the retaliation provision was specifically designed to guard against. *Id.*, at *8 (quoting *Burlington*, 126 S.Ct. at 2415). Because the plaintiff's performance evaluations changed significantly *after he filed a charge of discrimination* with the EEOC, the *Halfacre* court concluded that the case should be remanded, in part, for further discovery on the issue of whether the lower performance

18

evaluation scores rose to the level of a materially adverse employment action as defined in *Burlington*. *Id.,* at *9.[9]

The facts of this case are distinguishable from those in *Halfacre*. Here, the plaintiff received his first lowered performance evaluation score *before* he filed a charge of discrimination. The plaintiff's first lowered evaluation covered the period from November 12, 1997, to November 12, 1998, and the plaintiff received this report in January 1999, well before he filed his June 1999 EEO complaint, and indeed, well before the incident giving rise to the complaint of discrimination (the June 1999 meeting) had even occurred. Therefore, the strong inference in *Halfacre* that the lowered performance evaluation scores were a direct result of the plaintiff's engaging in protected activity is simply not present here. The plaintiff's scores were on the decline six months prior to his complaint of discrimination. The fact that they continued to worsen following his charge of discrimination is not as clearly attributable to employer retaliation as in the *Halfacre* scenario. Rather than the sudden, dramatic drop in very close temporal proximity to the complaint of discrimination in *Halfacre*, the facts in this case show a preexisting slide in

---

[9]Remand was additionally appropriate in light of the parties' failure to separately address the fourth prong of the prima facie case, the employer's legitimate, non-discriminatory reason, and whether the plaintiff could prove pretext. *Id.,* at *9 (citing *Randolph v. Ohio Dep't of Youth Servs.,* 453 F.3d 724, 737 & n. 4 (6th Cir. 2006) (remand to the district court was appropriate in light of the parties' failure to brief issues beyond the prima facie case)).

19

scores that began well before the charge of discrimination was made. Thus, in this case, lowered performance evaluation scores simply do not rise to the level of an adverse employment action.

The plaintiff also claims that he was retaliated against because of an addendum to the 1998-1999 performance evaluation expressing concerns about his fitness for surgery. Specifically, the plaintiff alleges that Dr. Cumberbatch used concerns about the plaintiff's personal health as a pretext to justify revocation of his surgical privileges. Even taking all of the facts in the light most favorable to the plaintiff, there is simply no support for this claim in the record.

The plaintiff admitted that he was on an extended period of sick leave during the time relevant to this portion of his claim, from about November 2, 1999, through August 13, 2000, due to health problems, including multiple surgeries on his foot and the amputation of his left great toe. *See* Exhibit 2, at 32-33, Docket Entry No. 27. The plaintiff stated in his December 2000 EEO interview that he performed his last surgery in 1999, prior to going on his extended sick leave. He further confirmed that he had *voluntarily* performed no surgeries in the year 2000 since returning from sick leave. *See id.*, at 31. The plaintiff stated that the reason he had not performed any surgeries was because he was recovering from his own surgeries and because he had promised Dr. Jones, the Chief of Staff, that he

"would not go into the [operating room] until the foot [was] completely closed and healed." *See id.*, at 31-32. Relevant portions of the EEO interview are as follows:

> Q. So, the procedure you had done [amputation of big toe] is preventing you from . . . doing surgery?
>
> A. What I am doing, I am allowing my foot to heal. I'm going to stay off of it. I'm not going to stand two and three hours in one spot and cause my foot to swell up.

*Id.*, at 29. The plaintiff then related that he had not performed any surgeries in the year 2000 following his return to work.

> Q. Okay. Is that [no surgeries in 2000] a direct – directly related to your personal surgeries that you had?
>
> A. That is related to the personal surgery and also related to the fact that I promised Dr. Jones [Chief of Staff and Dr. Cumberbatch's supervisor], since she had concerns, that I would not go into the OR until the foot is completely closed and healed.

*Id.*, at 31-32.

The alleged revocation of the plaintiff's surgical privileges occurred in May 2000 when Dr. Cumberbatch amended the plaintiff's 1998-1999 proficiency report to include his concerns about the plaintiff's health problems and their impact on the plaintiff's ability to "perform in an operating room setting." *See* Exhibit A-6 to Docket Entry No. 27. It is not entirely clear whether Dr. Cumberbatch ever effectively suspended, revoked, or otherwise put into effect any restriction on the plaintiff's surgical privileges whatsoever. During his interview with the EEO examiner in December 2000, the plaintiff discussed a letter dated

21

November 4, 1999, in which he alleges that Dr. Cumberbatch stated that the plaintiff was prohibited from doing certain types of surgeries unless he had Dr. Burns' supervision. *See* Exhibit 2, at 29-30, Docket Entry No. 27. The plaintiff also stated that Dr. Jones, Dr. Cumberbatch's superior, replied to Dr. Cumberbatch's letter and told him that the plaintiff did have surgical privileges and that Dr. Cumberbatch could not impose such restrictions on the plaintiff alone without including the rest of the podiatrists on staff. *Id.*, at 30-33. Neither Dr. Cumberbatch's letter nor Dr. Jones' response is included anywhere in the record, though these documents may have originally been included as attachments to the plaintiff's EEO testimony.

Even assuming, *arguendo*, that the plaintiff's surgical privileges were restricted, any such action cannot be considered an adverse action under the circumstances presented in this case. Even if Dr. Cumberbatch successfully interfered with the plaintiff's surgical privileges on November 4, 1999, or on May 19, 2000, the plaintiff was at that time on medical leave, and would not return until August 2000. Upon his return, the plaintiff admits that he actually did have surgical privileges, but that he was voluntarily keeping himself out of the surgical suite in light of his own recent surgeries and ongoing recovery and healing process. *See id.*, at 28.

As the *Burlington* Court emphasized, "the significance of any given act of retaliation will often depend on the particular circumstances." 126 S.Ct. at 2415. Under some

circumstances, the suspension of a doctor's surgical privileges may well amount to an adverse employment action under the *Burlington* standard. However, those circumstances are not present in this case. The plaintiff was out on a very extended sick leave when the alleged suspension occurred. His privileges were, by his own admission, restored (or remained intact) at the time he returned to work in August 2000. The reason the plaintiff did not return to surgical duties was because of his self-imposed attempt to complete his own healing process, as a result of his recent multiple surgeries and difficult recoveries. The plaintiff suffered no actual loss of pay, prestige, or privilege, nor indeed, any other ill effects whatsoever because of any alleged restriction or revocation of his surgical privileges, because he simply was not present for such detrimental effects to accrue. When he did return to work, the plaintiff prevented *himself* from performing surgeries, much like the plaintiff in *Secherest* requested at least one of the transfers which she later claimed was retaliatory.[10] Under the totality of these circumstances, the alleged revocation of the

---

[10]Furthermore, though this line of reasoning is probably more appropriate to a discussion of rebutting pretext, an issue that the Court does not reach here, *see infra* note 11, the plaintiff's supervisor, Dr. Cumberbatch, had previously raised concerns about the plaintiff's health and fitness for surgical duties in a letter dated January 22, 1999 (Exhibit C-13 to Docket Entry No. 27), six months prior to the plaintiff's protected EEO activity. The fact that Dr. Cumberbatch voiced similar concerns about the plaintiff's health problems and their possible impact on his job duties both six months before and nearly one year after the plaintiff's complaint of religious discrimination casts serious doubt on the plaintiff's assertions that Dr. Cumberbatch was retaliating against him the second time around.

plaintiff's surgical privileges simply does not rise to the level of an adverse employment action.

Therefore, the plaintiff has failed to establish the third prong of his prima facie case. If the plaintiff fails to establish an essential element of the prima facie case, the case simply cannot go forward. The plaintiff must present evidence sufficient to show that a genuine issue of material fact exists and that he could succeed on the merits of his claims based on the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. The plaintiff is not entitled to a trial solely on the basis of his allegations. *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). To put it even more bluntly, at the summary judgment stage, the movant challenges the opposing party to "put up or shut up on a critical issue." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989) (internal quotations omitted). The

24

plaintiff has failed to present evidence that tends to establish that he suffered an adverse

employment action, an essential element of his prima facie case.[11]


## III. CONCLUSION

The plaintiff has failed to offer proof establishing the existence of a genuine issue of

material fact with respect to an essential element of his prima facie case. An appropriate

order will enter.


JULIET GRIFFIN
United States Magistrate Judge

---

[11]In *Halfacre*, the Court of Appeals criticized the parties' tunnel vision in focusing solely on a single prong of the prima facie case and ignoring the remaining prongs of the *McDonnell Douglas* framework, and the Court cited this failure as an additional reason that remand was appropriate in that case. *See* 2007 WL 1028860 at * 9 *and see supra* note 9. Although it appears that the parties here have been similarly myopic, this does not mean that this Court or the parties should be forced to proceed with further discussion or analysis of the remaining *McDonnell Douglas* factors. It is the plaintiff's burden to make out a prima facie case. Without a prima facie case, the burden can never shift to the defendant to articulate a legitimate, non-discriminatory reason, nor can it then shift back to the plaintiff to establish that this reason was a pretext for retaliation. In *Halfacre*, the Court concluded that the lowered performance evaluations may amount to an adverse employment action, and therefore, remanded the case to allow the plaintiff to attempt to make out a prima facie case under the changed *Burlington* standard. The Court here concludes that even under the new standard, neither the lowered evaluations nor the alleged revocation of surgical privileges amount to adverse actions in these circumstances. Therefore, the plaintiff cannot make out a prima facie case, and the analysis is properly halted at this stage, without further discussion of the remaining *McDonnell Douglas* factors.

25